**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO.: 5:03CV136-V**

| | |
|---|---|
| **MARY E. JACKSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )  _____   **ORDER** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**THIS MATTER** is before the Court on Plaintiff's "Motion for Summary Judgment" and

"Memorandum of Law," both filed February 9, 2004, and the Defendant's "Motion for Summary

Judgment" and "Memorandum in Support of the Commissioner's Decision," both filed March 11,

2004. Having considered the written arguments, administrative record and applicable authority,

for the below-stated reasons, Defendant's Motion for Summary Judgment is <u>denied</u> and the

<u>decision of the Commissioner is reversed and the cause remanded to the Administrative Law</u>

<u>Judge</u> for a re-hearing and further consideration consistent with this opinion. *See* 42 U.S.C.

405(g).

## I. PROCEDURAL HISTORY

On April 23, 2001, Mary Jackson ("Plaintiff" or "Jackson") applied for disability insurance

benefits and supplemental security income benefits, alleging she became disabled on February 19,

2001 due to fibromyalgia and depression. Plaintiff's claim was denied initially and on

reconsideration. Plaintiff requested a hearing on the matter, and a hearing was held before an

Administrative Law Judge ("ALJ") on March 13, 2003. The ALJ issued a decision on June 12, 2003, denying Plaintiff's claim for benefits. On September 4, 2003, the Appeals Council denied Plaintiff's Request for Review, thereby finalizing the Commissioner's June 12, 2003 decision.

Plaintiff filed this action on October 22, 2003, and the case is now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

Plaintiff was born on June 4, 1959. Although Plaintiff did not graduate from high school, she has held jobs in the past at Wal-Mart and a textile company.[1] Most recently Plaintiff has worked in a cafeteria as a food server and cashier and at a textile company where she rewound spools of fiberglass. (AR 103).[2]

Plaintiff claims that she has been unable to work since February 21, 2001 due to fibromyalgia and depression. Plaintiff claims that the fibromyalgia causes pain in her neck, back, joints and muscles. (AR 50). She also claims that she has been diagnosed with osteoarthritis, loss of bone density, scoliosis, and a compression fracture. ( *Id.*). Plaintiff has taken a variety of medications during the relevant time period, including Salsalate, Meclizine, Notriptyline, Hydroxyzine Hcl, Ultram, Celexa, Premarin, Hydroxyz PAM, Nexium, Claritin, Imitrex, Ambien, Prop-N/AP, Topamax, and Zoloft. (AR 100, 102, 113).

Plaintiff saw Dennis Payne, M.D., on June 1, 1999 complaining of "knots" on the back of her quadriceps. She also complained of a constant ache in her lower extremities, which was

---

[1] The record is inconsistent as to what grade Plaintiff actually completed. Various statements made by Plaintiff to different doctors indicated that Plaintiff completed either seventh, eighth, or eleventh grade. Plaintiff also asserted that she only has one more test before she completes her GED. (AR 81, 96, 119, 136).

[2] Portions of the Administrative Record are cited herein as "AR" with the relevant page number.

worsened by activity.  (AR 117).  Dr. Payne agreed with Plaintiff's prior diagnosis of

fibromyalgia, noting she had "classical signs and symptoms" for the condition.  (AR 118).  He

changed her medication from Xanax to Clonazepam.  He also discussed with Plaintiff a stretching

and aerobic exercise program.  (AR 118).

On January 29, 2001, Plaintiff saw George Gould, M.D., complaining of a sinus infection.

Dr. Gould noted that Plaintiff had constant exposure to fiberglass, which exacerbated her sinus

problems.  Dr. Gould further noted in his report that Plaintiff's fibromyalgia was "getting worse."

Plaintiff had been taking Effexor (prescribed to her by Dr. Payne) but Effexor was giving her

hallucinations.  Dr. Gould thought it best for Plaintiff to stop taking Effexor and revisit Dr. Payne.

On February 11, 2001, Plaintiff reported to the emergency room at Grace Hospital

complaining of "feeling tired and weak with some chronic right upper quadrant pain."  (AR 110).

Plaintiff was examined by Robert Grose, M.D., who diagnosed Plaintiff with acute bronchitis and

a urinary tract infection.  Plaintiff was given a prescription of Augmentin and was discharged.

(*Id.*).    On February 12, 2001, Plaintiff returned to Dr. Gould for prescriptions.  Dr. Gould noted

that Plaintiff continued to work at the textile plant and that the fiber optics made "her itch to

death" and bothered "her nose and upper airways." (AR 111).  He noted that she was considering

finding another job.  ( *Id.*).

On April 3, 2001, Plaintiff saw Dr. Payne again.  She reported to him that she remained

"stiff and sore" and that she was sleeping poorly. (AR 128).  She reported that her "function is of

severity that she cannot do more than self care." ( *Id.*).  Dr. Payne prescribed a trial of Celexa.

(*Id.*).  He also indicated in his handwritten notes that Plaintiff was "unable to work at present."

(*Id.*).

3

Mr. John Bevis, M.A., L.P.A., performed a psychological evaluation on Plaintiff on June 10, 2001, and concluded that Plaintiff:

> was oriented except for the correct day of the month and was only minimally aware of important current events. She ambulated slowly and reported considerable discomfort and pain in her muscles and joints which limits her physical activities. She appeared to be appropriately responsive and fluent in conversation, though she reported problems with her concentration and memory. . . . [Plaintiff] related that she worked for about six months in a fiberglass plant until she had to quit work in February 2000, due to her poor health. . . .[3] She reported a history of problems with fibromyalgia, carpal tunnel syndrome, and migraine headaches. She described chronic pain in her back, shoulders, arms, and legs as well as low energy which prevents her from performing most household responsibility, especially lifting and bending. . . .

(AR 119-20). Mr. Bevis evaluated Plaintiff's mental status as follows:

> [Plaintiff] exhibited a good reality contact and was alert and responsive . . . but exhibited a sad and worried demeanor. . . . [Plaintiff] reported that she feels extremely distraught and worried and experiences chronic pain.

(AR 120). Plaintiff was able to recall four digits forward and two digits backward. She displayed good recent memory and "adequate" remote memory. (*Id.*). She made several errors when attempting to count by serial 3's "due to her poor concentration." (AR 121). Mr. Bevis' diagnostic impression was that Plaintiff suffered from fibromyalgia, major depression (moderate), carpal tunnel syndrome, migraine headaches, and chronic pain syndrome. (*Id.*). Mr. Bevis concluded:

> [Plaintiff] appears to be functioning within the borderline range of intelligence. She was able to understand and follow most simple instructions. Her attention span significantly interfered with her ability to perform repetitive tasks. She may experience problems relating to fellow workers and supervisors. Her tolerance for stress and pressure associated with a work routine will significantly interfere with her work performance. She does appear to be capable of managing her personal,

---

[3]The Court notes that although Mr. Bevis noted that Plaintiff had to quit working in a fiberglass plant in February 2000, Plaintiff advised Dr. Gould on February 12, 2001, that she continued to work in a textile plant and was considering finding another job. (AR 111, 120).

financial, and business affairs with occasional assistance.

(AR 121).

On July 9, 2001, Dr. Larry Anderson of Carolina Orthopaedic Specialists examined Plaintiff. Plaintiff's chief complaint was that she had "pain all over," including in her neck, back, tailbone, feet, skin, arms, and legs. (AR 132). Plaintiff informed Dr. Anderson that she had been treated by Dr. Payne in the past for fibromyalgia. ( *Id.*). She also told Dr. Anderson that she fell in Florida six or seven years ago, and she suspected that this fall might have started her problem with pain. (*Id.*). As of this visit, Plaintiff was taking Premarin, Vistaril, Celexa, Skelaxin and Motrin. Dr. Anderson noted that Plaintiff was 5'5", weighed 236 pounds and smoked two packs of cigarettes a day. ( *Id.*). Dr. Anderson made the following observations of Plaintiff's physical condition:

> [Plaintiff] ambulates freely with no antalgic gait. She is able to move on and off the examining table without any significant discomfort apparent. The cervical spine has full painless range of motion. The shoulders, elbows, wrist and fingers have full motion with no evidence of deformity. The lumbar spine has full forward flexion, lateral bending and extension with no muscle spasm. . . . She is able to heel and toe walk without apparent weakness. The hips, knees and ankles have full motion with no deformity or instability. The feet and ankles appeared structurally normal. She did have multiple sites of tenderness to palpation including in the posterior cervical region, left trapezius area, anterior shoulders, lumbosacral area, mid-thoracic spine and medial knee areas.

(AR 132-33). X-rays revealed that the vertebrae were normally aligned, that there was no evidence of any significant anterior spurring or spondylolisthesis and that the sacroiliac joints appeared normal. (AR 133).

On July 25, 2001, Marc Guerra, M.D., of Caldwell Family Physicians examined Plaintiff due to her complaints of multi-joint pain and stiffness, especially in the morning. (AR 131). Dr.

Guerra noted that Plaintiff suffered from an "arthritic condition" and prescribed a clinical trial of Vioxx. He directed Plaintiff to return to the clinic in two weeks. On August 8, 2001, Plaintiff returned to see Dr. Guerra complaining of difficulty with insomnia, "concentrating, focusing and executing." (AR 130). Dr. Guerra's impressions were that Plaintiff displayed "multiple trigger point tenderness consistent with fibromyalgia." ( *Id.*). He recommended a prescription of Pamelor to induce sleep and suggested that Plaintiff attend "water therapy" to treat her fibromyalgia. ( *Id.*). Plaintiff saw Dr. Payne again August 16, 2001 complaining of soreness in hands, arms, back, neck and coccygeal area and that she was "stiff constantly." (AR 127). Plaintiff reported that she was not working and that her sleep was poor and nonrestorative. ( *Id.*). Dr. Payne prescribed a trial of Relafen and noted that he had "little else to offer at this point." (*Id.*).

Dr. Sandra Buchin, a DSS Medical Consultant, performed a physical residual functional capacity ("RFC") assessment on August 21, 2001. Dr. Buchin found that Plaintiff could occasionally lift or carry 50 pounds, could frequently lift or carry 25 pounds and could push and/or pull without limit. (AR 163). She further determined that Plaintiff could stand or walk for a total of six hours in an eight-hour workday and could sit for a total of about six hours in an eight-hour workday. (*Id.*). Dr. Buchin found no postural, manipulative, visual, communicative, or environmental limitations. (AR 164-66).

On September 10, 2001, Dr. Marianne Breslin, a DDS Psychiatric Consultant, examined Plaintiff. She rated Plaintiff's functional limitations and found that Plaintiff had no restrictions of daily living activities, that Plaintiff had "mild" difficulty maintaining social functioning, and that

Plaintiff suffered "moderate" difficulties maintaining concentration, persistence, or pace. (AR 154). She noted that Plaintiff suffered from major depression (moderate) and chronic pain syndrome. (AR 156).

During this examination, Dr. Breslin also performed a mental RFC assessment of Plaintiff. She examined Plaintiff in the categories of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." (AR 158-59). Dr. Breslin found that Plaintiff was only "moderately limited" in several instances and "not significantly limited" in the majority of areas of examination. ( *Id.*). For example, Dr. Breslin found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions and her ability to maintain attention and concentration for extended periods. (AR 158). Dr. Breslin also found that Plaintiff was "not significantly limited" in her ability to understand and remember very short and simple instructions, her ability to work in coordination with others without being distracted by them or in her ability to make simple work-related decisions. (AR 158-59). Dr. Breslin did not find Plaintiff was "markedly limited" in any area of examination. ( *Id.*). Dr. Breslin concluded that Plaintiff could perform simple routine repetitive tasks "in a low production type of job or in a non-demanding environment." (AR 160).

Plaintiff was further examined by Dr. Guerra on several occasions during the fall of 2001. On September 18, 2001, Dr. Guerra's  impressions were that Plaintiff suffered from fibromyalgia, connective tissue disease and osteoporosis. (AR 124). He recommended Miacalcin and Augmentin for a sinus infection. ( *Id.*). On October 3, 2001, Plaintiff visited Dr. Guerra complaining of headaches, diplopia, dizziness, balance difficulties, and easy fatigability. (AR

123).  He recommended that Plaintiff have an MRI to rule out a lesion on the brain.  On October

10, 2001, Plaintiff returned to see Dr. Marc Guerra.  Dr. Guerra noted that Plaintiff has "multiple

medical problems," including obesity and fibromyalgia.  He "strongly recommended" that Plaintiff

diet, exercise, and lose weight.  (*Id.*).

Plaintiff saw Mr. Bevis a second time on December 8, 2001.  Mr. Bevis observed that

Plaintiff "ambulated slowly while reporting severe pain and discomfort throughout her body."

(AR 136).  Plaintiff displayed a "subdued and often tearful demeanor."  ( *Id.*).  Mr. Bevis

observed that Plaintiff was not oriented to the correct year, month, day of the month, or day of

the week.  (*Id.*).  Plaintiff suggested that her medications were causing some of her confusion.

Plaintiff indicated to Mr. Bevis that she experiences chronic pain in her muscles and joints

and that this pain prevented her from engaging in most normal physical activities.  She further

reported problems with "confusion, memory loss, poor concentration, and auditory

hallucinations."  (*Id.*).  As of this date, Plaintiff was taking Celebrex, Pamelor, Ultram, Flexeril,

Vistaril, Celexa, Premarin and Antivert.

Mr. Bevis made the following observations concerning Plaintiff's mental health:

> [Plaintiff] exhibited an adequate reality contact.  She demonstrated reduced
> alertness with some apparent confusion and difficulty responding appropriately to
> some personal questions.  She reported that she experiences chronic pain in her
> muscles and joints.  She exhibited a rather subdued and tearful demeanor. . . .
> [Her speech] appeared slow with some apparent confusion. . . .  Ms. Jackson
> reported chronic pain in her muscles and joints with feelings of depression and loss
> of energy and initiative. . . .  Ms. Jackson experienced some difficulty organizing
> and expressing her thoughts due to confusion and a paucity of ideas. . . .  Ms.
> Jackson reported that she experiences auditory hallucinations as she hears people's
> voices when no one is around.

(AR 137).  Mr. Bevis further observed that Plaintiff was not oriented to the date or day of the

week.  She was unable to "appropriately relate recent activities as she reported that she feels confused and is experiencing severe pain which interferes with her ability to think logically." (*Id.*).  Mr. Bevis observed that Plaintiff was not aware of most current events and could identify only one of four recent presidents.  Plaintiff was unable to count by serial threes which, according to Mr. Bevis, was "due to her poor concentration and apparent confusion."  (AR 138).  Mr. Bevis' diagnostic impressions were that Plaintiff suffered from major depression (moderate), fibromyalgia, scoliosis, carpal tunnel syndrome, osteoarthritis, chronic pain disorder and "possible organic mental disorder NOS."  (*Id.*).  He concluded:

> [Plaintiff's] attention span severely interfered with her ability to perform repetitive tasks.  She will experience severe problems relating to fellow workers and supervisors.  Her tolerance for stress and pressure associated with a work routine will severely interfere with her work performance.  She will require frequent assistance in managing her personal, financial, and business affairs.

(*Id.*).

On December 14, 2001, after a review of Plaintiff's file, Dr. Steve Salmony, a DSS Psychological Consultant, affirmed Dr. Breslin's September 10, 2001 PRTF Assessment.  Dr. Salmony commented that the prior PRTF showed "limitations to SRRTs in a low production environment."  (AR 142).  Similarly, Dr. David Buchin affirmed Dr. Sandra Buchin's August 21, 2001 PRTF assessment, concluding that the prior RFC shows that Plaintiff is limited to "medium" work and that the current medical records support these restrictions.  (AR 143).

Plaintiff saw Dr. Karl Schroeder, a psychiatrist, on January 31, 2002.  Plaintiff reported to Dr. Schroeder that she had felt depressed for more than a year, that she stayed very tired and could only sleep three to four hours a night.  She further reported auditory hallucinations,

irritability, crying, impairment of concentration and memory, and withdrawn behavior. (AR 179).

Dr. Schroeder examined Plaintiff and reported:

> [Plaintiff] was quite tense. Mood is depressed. . . . Thoughts have tight associations. There are no hallucinations. She is oriented x four. Memory is intact for recent and remote events. She recalls 3 of 3 words at 3 minutes. She knows the current president. Fund of knowledge is average or better. Insight into depression is good. Judgment is intact.

(AR 180). Dr. Schroeder noted that he wanted to wean Plaintiff from Celexa and start her on Paxil. (*Id.*).

On February 28, 2002, Plaintiff referred herself to Dr. McCain's arthritic clinic. In his notes, Dr. McCain reported that Plaintiff carried a diagnosis of fibromyalgia and osteoarthritis. (AR 173). Plaintiff reported to Dr. McCain that she had symptoms for five years but there had been a worsening of symptoms within the last year and particularly within the past three months. (*Id.*). Plaintiff described her pain as dull and aching and occurring in her neck, shoulders, low back, hips, ankles and knees. (*Id.*). Plaintiff rated her pain as a 10 on a scale of 1 to 10. (*Id.*). Plaintiff also reported that her fatigue was as disabling as the pain and rated her fatigue at a 10 on a scale of 1 to 10. (*Id.*). Dr. McCain noted that there is no joint swelling or restricted range of motion. As of the date of this exam, Plaintiff was taking the following medications: Aciphex, Nexium, Claritin, Meclizine, Hydroxyzine, Estrogen replacement, Ultram, Salsalate, Paxil and Nortriptyline. (*Id.*).

Dr. McCain's physical examination revealed a "pleasant, somewhat depressed, healthy-appearing woman" who was considerably obese. (AR 174). Examination of Plaintiff's musculoskeletal system was normal with the exception of mild crepitus in her left knee. A soft

tissue examination revealed all 18 fibrostic tender points. ( *Id.*).  Dr. McCain noted the following

clinical impressions:

> This woman has very significant fibromyalgia syndrome.  She has significant
> intrusion into her daily routine.  I would certainly consider her disabled for the
> performance of any and all occupations presently.  I don't think a strictly medicinal
> approach is going to return her no [sic] normal functioning.  I have recommended
> that we put her into our pain management program at Presbyterian Rehabilitation. .
> . . She seemed quite interested in this.

( *Id.*).  Dr. McCain asked Plaintiff to stop taking Aciphex, Ultram, Salsalate, Hydroxyzine, and

Meclizine.  He put her on Darvocet and Ambien.  (AR 175).

Dr. Schroeder saw Plaintiff a second time on March 15, 2002.  Plaintiff had been taking

Paxil but did not feel that it had helped her depression. (AR 178).  Dr. Schroeder reported he

would discontinue the Paxil and replace it with Effexor.  ( *Id.*).

On May 2, 2002, Dr. Glenn McCain again examined Plaintiff "for her fibromyalgia and

depression."  (AR 172).  Dr. McCain's examination of Plaintiff revealed the presence of 18

fibrostic tender points. ( *Id.*).  He noted that Plaintiff had a "very positive response" to some of

the educational material that Dr. McCain had given to her.[4] ( *Id.*).  Plaintiff started a diet and

walking program and Dr. McCain urged her during this visit to continue watching her weight.

(*Id.*).  They also discussed coping strategies and depression.  Dr. McCain noted that he was

pleased with Plaintiff's initial response and he told Plaintiff that it is "up to her to keep up a

consistent effort." ( *Id.*).  Dr. McCain also noted in his report that Plaintiff "has not missed the

medications that [he] asked her to stop." ( *Id.*).  Plaintiff told Dr. McCain that Darvocet

eliminated 50% of her pain.  (*Id.*).

---

[4]The Court presumes that the educational materials were in relation to fibromyalgia.

Dr. Schroeder examined Plaintiff again on May 10, 2002. He reported that the Effexor appeared to be helping Plaintiff with anxiety and that she seemed to be sleeping well. (AR 177).

Plaintiff reported back to Dr. McCain on August 5, 2002. Dr. McCain, at the outset, noted that Plaintiff "is not doing well. . . . She continues with a litany of musculoskeletal as well as other organ system complaints. She has lapsed into pain-contingent thinking and acting in a pain-contingent manner." (AR 186). Plaintiff reported that she continued to have difficulty sleeping and was not "practicing good sleep hygiene." (*Id.*). Physical examination of Plaintiff again revealed 18 fibrostic tender points and no other musculoskeletal abnormalities. (*Id.*). Dr. McCain reported that anxiety was a major issue for Plaintiff and discussed with her non-medicinal ways to manage her anxiety.

Plaintiff went back to Dr. Schroeder August 9, 2002. She informed him that she was partially benefitting from the Effexor but was not completely satisfied. (AR 176). Plaintiff identified a problem with sleeping patterns. (*Id.*). Dr. Schroeder prescribed Seroquel and hoped that it would return Plaintiff to a regular sleep pattern in about a week. (*Id.*).

Plaintiff saw Dr. McCain again on October 9, 2002. Dr. McCain reported that Plaintiff had continued "to try very hard to follow [his] suggestions regarding non-medicinal pain management strategies." (AR 184). Plaintiff had lost a total of forty pounds and was exercising more regularly. A physical examination again revealed 18 fibrostic tender points and no other new findings. (*Id.*). Dr. McCain also reported that Plaintiff is starting to feel "a greater sense of control." (*Id.*).

Plaintiff reported back to Dr. McCain three months later, on December 17, 2002,

complaining of headaches. Plaintiff reported that she did not feel the Darvocet was helping and that she has become increasingly depressed. (AR 185). Examination again revealed 18 fibrostic tender points but that power, tone and coordination were normal. (*Id.*). Dr. McCain sent Plaintiff to a neurologist and informed her that fibromyalgia can cause the symptoms of which she complained. (*Id.*).

Dr. McCain reexamined Plaintiff on April 10, 2003. He reported that Plaintiff's "pain and fatigue continue at a high level, each rated at 7 to 8 out of 10." (AR 183). Examination again showed presence of 18 fibrostic tender points. (*Id.*). Dr. McCain and Plaintiff decided that Plaintiff would continue taking Ambien and Darvocet. ( *Id.*).

### III. STANDARD OF REVIEW

The Social Security Act requires this Court to uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard. 42 U.S.C. §§ 405(g), 1383(c)(3); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig*, 76 F.3d at 589 (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* (*quoting Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). "Where conflicting evidence allows reasonable minds to differ as to whether claimant is disabled, the responsibility for that

decision falls on the [Commissioner]." *Id.* (*quoting Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Even if the reviewing court disagrees with the outcome, the decision of the Commissioner is not overturned as long as there is "substantial evidence" in the record to support the final decision below. *Lester v. Schweiker*, 683 F.2d 838, 841 (4ᵗʰ Cir. 1982). The issue before the Court, then, is not whether Jackson was disabled, but whether the ALJ's finding that she was not disabled is supported by substantial evidence and was reached based upon a correct application of the law. *Craig*, 76 F.3d at 589.

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether Plaintiff was "disabled" within the meaning of the Social Security Act, 42 U.S.C. § 301 *et seq*.[5] After reviewing the evidence and medical records in this case, the ALJ determined that: (1) Plaintiff had not engaged in substantial gainful activity since February 19, 2001; (2) Plaintiff's only severe impairments were fibromyalgia and moderate depression; (3) Plaintiff's impairments did not meet or equal any of the listed impairments contained in 20 C.F.R. Part 404, Appendix 1; (4) Plaintiff retained the RFC to perform medium work and while her RFC precluded Plaintiff from performing her past work as a pairer/folder, Plaintiff was able to return to her past relevant work as a cook/waitress; and (5) Plaintiff was not disabled and therefore not entitled to receive Disability Insurance Benefit payments.[6]

---

[5]Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 301; *see also Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

[6]The ALJ followed the sequential evaluation process set forth in 20 C.F.R. § 404.1520.

Plaintiff essentially assigns three errors to the ALJ's determination. First, Plaintiff assigns error to the manner in which the ALJ reviewed the evidence and weighed the reports of various physicians. Second, Plaintiff argues that the ALJ's determination that Plaintiff retained the RFC to perform "medium" work was not supported by substantial evidence. Finally, Plaintiff contends that substantial evidence did not support the ALJ's finding that Plaintiff's testimony was not credible.

The Court concludes that the ALJ's decision was flawed in many respects. The Court's duty is not to pass on whether Jackson is actually disabled. Rather, it is the duty of the Court to decide only whether the decision was supported by substantial evidence and was reached upon a correct application of the law. Without reaching the former issue, the Court holds that the ALJ did not correctly apply the law to the facts of this case.

## A.     The Difficulty of Diagnosing Fibromyalgia Must be Considered in the ALJ's Evaluation of Disability Claim

Fibromyalgia poses particularly difficult issues in Social Security disability cases because diagnosing fibromyalgia rests primarily on a patient's subjective complaints of pain. The Fourth Circuit has addressed few claims for disability based on fibromyalgia, but examination of case law from sister circuits has provided a helpful summary of the disease and the peculiar issues associated with evaluating it in the context of claims for Social Security disability benefits.

Fibromyalgia is an "elusive" and "mysterious" disease with no known cause and no known cure. *See Swain v. Comm'r of Social Security*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003). There is no laboratory test for detecting and diagnosing the disease's presence or severity. *Id.* (*citing Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). In one of the first cases to address

fibromyalgia in the context of a Social Security disability claim, the Sixth Circuit described

fibromyalgia as follows:

> As set forth in the two medical journal articles [submitted to the Court], fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients.

*Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 817-18 (6th Cir. 1988).

There are no objective medical tests to conclusively confirm the presence of fibromyalgia.

*Preston*, 854 F.2d at 818; *Green-Younger*, 335 F.3d at 108. In fact, fibromyalgia "defies

diagnosis by objective clinical, diagnostic, or laboratory findings." *Swain*, 297 F.Supp.2d at 991.

"Unlike most diseases that can be confirmed or diagnosed by medical tests, fibrositis can only be

diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms

of musculoskeletal pain, stiffness, and fatigue." *Preston*, 854 F.2d at 819. Fibromyalgia sufferers

typically present normal muscle strength and neurological reactions and have a full range of

motion. *Id.* at 820. Physical examinations usually yield normal results. *Preston*, 854 F.2d at 818;

*Green-Younger*, 335 F.3d at 109.

The most well-established method of diagnosing fibromyalgia is the presence of "tender

points" in eighteen different locations on the patient's body. According to the American College

of Rheumatology website, "diagnosis is based on the patient's description of chronic widespread

pain for at least three months and the finding of many areas of muscle tenderness on

examination." *See* American College of Rheumatology, Fibromyalgia Fact Sheet,

http://www.rheumatology.org/public/factsheets/fibromya.asp (updated October 2003).

Thus, the elusive nature of fibromyalgia complicates the task of determining whether it is disabling. *Id.* The ALJ must pay particular attention to evaluating a claimant's subjective complaints of pain, the treating physicians' diagnoses and a claimant's credibility in describing the severity of her pain.

**B.     The ALJ Improperly Dismissed Jackson's Subjective Complaints of Pain**

   **1.     Evaluating a claimant's subjective complaints of pain**

When evaluating a claim for disability, the regulations instruct the adjudicator to consider all of a claimant's symptoms, including her subjective complaints of pain and the extent to which these symptoms are consistent with the objective medical evidence.   20 CFR § 404.1529(a). Symptoms such as pain or fatigue will not be found to affect the claimant's ability to do basic work activities "unless medical signs or laboratory findings show that a medically determinable impairment is present." 20 CFR § 404.1529(b).  Since symptoms such as pain are entirely subjective and difficult to quantify, the adjudicator must consider statements of pain in context with the entire record and determine whether there are any inconsistencies between the claimant's statements and the rest of the objective medical evidence.  20 CFR § 404.1529(c)(3)-(4).

The Fourth Circuit Court of Appeals previously addressed the evaluation of subjective complaints of pain.  *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996).  The *Craig* court held that

"subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Id.* at 591. The Fourth Circuit noted that complaints of pain are not *per se* disabling, and subjective complaints of pain "cannot take precedence over objective medical evidence or the lack thereof." *Id.* at 592 (*quoting Gross v. Heckler*, 785 F.2d 1163, 1166 (4th 1986)).

The Fourth Circuit set forth a two-step framework for determining whether a person is disabled by pain. First, there must be objective medical evidence showing "the existence of a medical impairment(s) . . . which would reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 594; 20 C.F.R. §§ 416.929(b) and 404.1529(b). At this first stage of inquiry, the pain alleged is not directly the issue and the claimant is not required to show objective evidence of the pain. *Id.* Rather, "the focus is instead on establishing a determinable underlying impairment . . . which could reasonably be expected to be the cause" of the alleged pain. *Id.* at 594.

If the claimant meets her threshold obligation of showing objective medical evidence of a medical impairment reasonably likely to cause the pain alleged, the second step of the analysis requires the adjudicator to evaluate the intensity and persistence of the claimant's pain and the extent to which it affects her ability to work. *Id.* at 595. The adjudicator must consider the claimant's statements about her pain and "all available evidence, including the claimant's medical history, medical signs, and laboratory findings, any objective medical evidence of pain . . . and any

other evidence relevant to the severity of the alleged impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Id.*; *see also* 20 C.F.R. §§ 416.929(c)(3) and 404.1529(c)(3). Since pain is, by its very nature, a "subjective phenomenon," a claimant's allegations about the severity and persistence of her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself. *Craig*, 76 F.3d at 595. On the other hand, those complaints need not be accepted to the extent they are *inconsistent* with any available objective medical evidence. *Id.* (emphasis added).

**2.**    <u>**The ALJ did not apply the two-step framework to evaluate Jackson's subjective complaints of pain**</u>

The ALJ incorrectly evaluated Jackson's subjective complaints of pain by failing to follow the two-step process set forth in *Craig*. In this case, as in *Craig*, the ALJ did not consider the initial question of whether Jackson established objective medical evidence of an impairment capable of causing the degree and type of the pain she alleges. Instead, the ALJ proceeded directly and primarily to the determination that Jackson's subjective allegations of pain were not credible. Accordingly, this Court remands to the ALJ to determine, first, whether Jackson suffers from an objectively identifiable medical impairment - fibromyalgia - that could reasonably cause the pain of which she complains and, second, whether Jackson's fibromyalgia was capable of causing the degree and type of pain she alleged. In this regard, it is self-evident that the tenderness found in the 18 points by Jackson's physicians will be crucial to the determination of

the presence or absence of objective medical evidence supporting the subjective complaints of pain.

## C. The ALJ Incorrectly Evaluated the Opinions of Dr. McCain and Mr. Bevis in Determining that Plaintiff Was Not Disabled

The ALJ dismissed the opinions of Dr. McCain, Plaintiff's treating physician, and of Mr. Bevis, Plaintiff's psychologist. Dr. McCain opined in his records that Jackson was disabled and suffered from very severe fibromyalgia. The ALJ gave his opinion "little weight" because it was "based on [Jackson's] self-reported fibromyalgia symptoms and is not supported by credible detailed findings or a particularized functional assessment, as the regulation requires." (AR 18).

Mr. Bevis concluded that Jackson suffered from depression and that she would have difficulty functioning in a work environment. The ALJ gave the opinion of Mr. Bevis "no weight" because the psychological evaluations by Mr. Bevis were "unreliable, as usual," his findings "incredible," and he was not impartial. (*Id.*).

This Court finds that the ALJ did not apply the correct legal standards as set forth in the regulations and the relevant case law from the Fourth Circuit and other sister circuits reviewing claims for disability based on fibromyalgia.

### 1. Evaluating a treating physician's opinion as to whether a claimant is disabled

Generally, more weight is given to opinions from treating sources, as these sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment." 20 CFR § 404.1527(d)(2). If a treating source's opinion on the nature and severity of Plaintiff's impairment is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and *is not inconsistent* with the other substantial evidence in

your case record," it will be given controlling weight. *Id.* The Fourth Circuit follows the

"attending physicians" rule, which states that an opinion by a claimant's treating physician is

entitled to "great weight" and should not be disregarded unless there is persuasive contradictory

evidence. *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987); *see also Barkes v. Apfel*, 155 F.3d

557, 1998 WL 394178 at *6 (4th Cir. June 9, 1998).[7]

A statement by a treating physician that a claimant is "disabled," however, is not entitled

to controlling weight. In fact, the regulations specifically instruct the Commissioner to *not give*

*any special significance* to an opinion that a claimant is disabled because whether a claimant is

"disabled" is a legal conclusion reserved for the Commissioner. 20 CFR § 404.1527(e)(1)-(3).

"Giving controlling weight to such opinions would, in effect, confer upon the treating source the

authority to make the determination or decision about whether an individual is under a disability

and thus would be an abdication of the Commissioner's statutory responsibility to determine

whether an individual is disabled." *Policy Interpretation Ruling Titles II and XVI: Medical*

*Source Opinions on Issues Reserved to the Commissioner*, Social Security Ruling 96-5P, 1996

WL 374183 at *2 (July 2, 1996). Although such opinions are not given controlling weight, they

nevertheless must be evaluated and "must never be ignored." *Id.* The opinion should be

considered with the entire record "to determine the extent to which the opinion is supported by

the record." *Id.*

---

[7] The regulations require the ALJ to "always give good reasons" for the weight given to a treating source's opinion. *Id.*

a. *Evaluating a treating physician's opinions in fibromyalgia cases*

As the elusive nature of fibromyalgia has become better understood, courts have begun to recognize that the traditional formula for evaluating treating physicians' opinions is "ill-suited" to evaluating opinions about fibromyalgia. *Swain*, 297 F.Supp.2d at 991; *Green-Younger*, 335 F.3d at 106-09.

In *Green-Younger*, the Second Circuit concluded that the ALJ erred by failing to give controlling weight to the treating physician's opinion and by effectively requiring objective evidence beyond the clinical findings necessary to diagnose fibromyalgia. *Green-Younger*, 335 F.3d at 106. The ALJ in that case rejected the treating physician's opinion because it was based on a claimant's subjective complaints of pain. The court, however, noted that Green-Younger displayed symptoms to support a fibromyalgia diagnosis under the guidelines set forth by the ACR, including pain in all four quadrants of the body and pain in at least 11 of the 18 specified tender points. *Id.* at 107 (*citing* SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome, and Objective Medical Evidence Requirements for Disability Adjudication, at 5 (May 11, 1998)). Numerous other doctors who had examined Green-Younger concurred in the diagnosis of fibromyalgia. *Id.* The Second Circuit concluded that the treating physician's reliance on Green-Younger's subjective complaints "hardly undermine[d] his opinion as to her functional limitation." *Id.*

In *Swain*, the ALJ rejected the treating physician's diagnosis of fibromyalgia because he failed to provide objective clinical and medical support for his diagnosis and findings. *Swain*, 297 F.Supp.2d at 993. The treating physician, who specialized in the diagnosis and treatment of

fibromyalgia and had treated Swain for over a year, found that Swain exhibited pain in 18 of the 18 trigger points, that Swain suffered pain in all four quadrants of her body, and that all of the doctor's treatments – physical therapy, medication, and B-12 injections – gave no more than short-term relief to claimant. *Id.* The ALJ made no mention of the finding that claimant exhibited pain in 18 of the 18 designated tender points and relied instead on the fact that physical and neurological tests were normal. *Id.* The district court disagreed and concluded that the treating physician's diagnosis of fibromyalgia was "well supported by medically acceptable clinical and laboratory diagnostic techniques *suitable to the disease of fibromyalgia*." His diagnosis and course of treatment represented "all that can be medically done to diagnose Swain's fibrositis and to support his opinion of disability." *Id.* The district court concluded that the treating physician's opinion was entitled to controlling weight. *Id.*

The Eighth Circuit also found that the ALJ improperly discounted a treating physician's opinion that a claimant was disabled. *Forehand v. Barnhart,* 364 F.3d 984, 986 (8th Cir. 2004). The ALJ had dismissed the opinion because it was a "disability conclusion, 'which is reserved to the Commissioner.'" *Id.* The Eighth Circuit noted that the ALJ would have properly discounted the opinion if it was the only available record from the treating physician. *Id.* However, when the statement that claimant was disabled was viewed together with the larger record, including the medical record and the findings and diagnoses of past treating physicians, the statement appeared to be entirely consistent with the larger record and therefore entitled to more weight than the ALJ gave it. *Id.* at 986. The court also found that the ALJ erroneously gave too much weight to a doctor who examined claimant only once, whereas the physician opining that claimant was

"disabled" had examined claimant numerous times over a three year period.  *Id.* at 987.

        b.  *Evaluating state agency consultants' opinions*

The regulations also instruct the adjudicator how to evaluate opinions from medical consultants in the state agency.  Section 404.1527(f)(2)(I)-(ii) instructs the ALJ as follows:

> ALJ are not bound by any findings made by state agency medical or psychological consultants.  However, state agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, ALJ must consider findings of state agency medical and psychological consultants as opinion evidence.

Social Security Ruling 96-5P expands on this framework and states that the opinions of state agency consultants should be regarded as "expert opinion evidence of nonexamining physicians and psychologists and must address the opinions in their decisions."  *Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner*, Social Security Ruling 96-5P, 1996 WL 374183, at *6 (July 2, 1996).

As with other findings, the ALJ must explain in the decision the weight given to the opinions of a state agency medical or psychological consultant.  20 C.F.R. § 404.1527(f)(2)(ii). Furthermore, the regulations require the adjudicator to give more weight to a source that has examined the claimant than to the opinion of a source who has not examined the claimant.  20 C.F.R. § 404.1527(d)(1); *see Forehand*, 364 F.3d at 987 (finding that the ALJ erroneously gave too much weight to a doctor who examined claimant only once, whereas the physician opining that claimant was "disabled" had examined claimant numerous times over a three year period).

2.     **The ALJ's decision to accord little or no weight to the opinions of Dr.
       McCain and Mr. Bevis was an incorrect application of the law**

This Court concludes, without determining whether Jackson's fibromyalgia was disabling, that the ALJ did not properly assess the records of Dr. McCain or Mr. Bevis.

The ALJ rejected Dr. McCain's opinions concerning the diagnosis and severity of Jackson's fibromyalgia with only cursory regard for the evidence contained in his medical records and in the entire record. After assessing Dr. McCain's medical reports and Dr. McCain's conclusion that he considers Plaintiff "disabled for the performance of any and all occupations presently," the ALJ accorded these opinions little weight. (AR 18). The ALJ reasoned that these opinions were based on Plaintiff's self-reported fibromyalgia symptoms and were not supported by "credible detailed findings or a particularized function assessment, as the regulation requires." (*Id.*).

Dr. McCain examined Plaintiff on May 2, 2002, August 5, 2002, October 9, 2002, December 17, 2002, and April 10, 2003. At the February 28, 2002 examination, Dr. McCain reported that Plaintiff had "very significant fibromyalgia syndrome" which significantly intrudes into her daily routine. (AR 174). He further concluded that he would "certainly consider her disabled for the performance of any and all occupations presently." ( *Id.*). In May 2002, Dr. McCain reported that Darvocet eliminated 50% of Plaintiff's pain. (AR 172). This short-term relief is typical with fibromyalgia. ( *Id.*). On August 5, 2002, Dr. McCain noted that Plaintiff was "not doing well" and had lapsed into "pain-contingent thinking and acting in a pain-contingent manner." (AR 186). He also reported Plaintiff was not sleeping well and was not "practicing good sleep hygiene." (*Id.*). In his October 9, 2002 records, Dr. McCain noted some

improvements in Plaintiff's condition. (AR 184). In his April 2003 report, Dr. McCain did not

note any significant improvements or digressions in Plaintiff's condition. (AR 183). Notably, in

all of his reports, Dr. McCain reported that examination of Plaintiff revealed 18 of 18 fibrostic

tender points and consistently concluded that Plaintiff suffered from severe fibromyalgia.

On remand, the ALJ must determine whether Dr. McCain's opinions are consistent with

the record as a whole. If the ALJ concludes that Dr. McCain's opinion are consistent with the

record, the ALJ should accord them controlling weight because Dr. McCain, a specialist in

rheumatology who saw Plaintiff numerous times over a year-long period, should be viewed as a

treating physician. Even though Dr. McCain made a legal conclusion reserved for the

Commissioner that Jackson is disabled, his opinion should not be ignored.

Furthermore, the ALJ in this case, like the ALJ in *Green-Younger*, essentially required

objective evidence for a disease that eludes such measure. The ALJ failed to acknowledge that a

diagnosis of fibromyalgia is necessarily based on subjective complaints of pain and that there is no

way to objectively diagnose it other than based on a plaintiff's subjective complaints of pain on

the 18 fibrostic tender points. On remand, the ALJ must give due regard to the elusive nature of

fibromyalgia and determine whether Dr. McCain's diagnosis and opinions are supported by

medically acceptable diagnostic techniques "*suitable to the disease of fibromyalgia*." *Swain*, 297

F.Supp.2d at 993.

After reconsidering Dr. McCain's opinion with the record as a whole, the ALJ must again

determine the appropriate weight to be given to the opinions of the state agency consultants. The

ALJ must remain mindful of the fact that, although state agency consultants are entitled to "expert

opinion" status, their opinion must be viewed in accordance with 20 C.F.R. § 404.1527(d)(1),

which requires the ALJ to give more weight to a source that has examined Jackson than to the

opinion of a source who has merely reviewed Jackson's paper file. The state agency consultants'

opinions as to Plaintiff's RFC assessment may be considered as expert opinion evidence, but they

are by no means entitled to controlling weight and, like all other evidence, should be viewed in the

context of the entire record. Furthermore, the ALJ did not sufficiently elaborate on his reasons

for accepting their medical reports while rejecting those of other examining and treating

physicians. The ALJ's vague statement that he "generally concurs" with the assessment of the

state agency medical consultants while rejecting other reports of doctors who have examined

Jackson on numerous occasions is entirely insufficient.

The Court also finds that the ALJ's reasons to reject Mr. Bevis' opinion are unavailing.

The ALJ stated that he found the consultative psychological evaluations by Mr. Bevis "unreliable,

as usual." (AR 18). The ALJ stated:

> [Mr. Bevis] finds limited functional capacity, even though he reports only a
> moderate depression. Mr. Bevis also makes physical diagnoses, but he is not
> qualified to make such diagnoses because he is not a medical doctor. It is note
> worthy that he claimed that the claimant reportedly did not know the month, year,
> or day of the week, was confused and did poorly counting serial threes, but this
> appears incredible. The undersigned finds that Mr. Bevis lacks impartiality and
> gives his opinions no weight.

(*Id.*).

The ALJ is certainly entitled to rely on his own past and present observations of medical

professionals, but the fact that he did not find Mr. Bevis believable in past situations, without

more explanation, does not mean that Mr. Bevis was incredible in this situation. Each case should

be decided on its own facts, and Jackson should not be penalized in her claim for disability benefits because the ALJ had prior negative encounters with Mr. Bevis. At the very least, the ALJ must explain his reasoning in greater detail. Again, the Court is not passing on whether Mr. Bevis was credible or whether the record as a whole supports a finding that Jackson is or is not disabled. The Court only concludes that if the ALJ is going to summarily disregard the records of a medical professional who has seen Jackson on numerous occasions, he must explain his reasons in more detail.

**D.    The ALJ Should Reconsider His Credibility Findings In Light of the Law Applicable to Fibromyalgia Claims**

"Credibility determinations as to a claimant's testimony regarding [her] pain are for the ALJ to make." *Carr v. Sullivan*, 917 F.2d 1301 (4th Cir. 1990). This Court cannot replace the observations of the ALJ at the hearing with its own guess as to credibility. Instead, this Court looks only to the evidence supporting the ALJ's determination. With fibromyalgia disability claims, the fact that the disease cannot be confirmed by diagnostic testing places a premium on the assessment of the claimant's credibility because a physician's opinion must depend on the assessment of the patient's subjective complaints. *Swain*, 297 F.Supp.2d at 990. The ALJ must carefully articulate the reasons to support his credibility findings. *Id.*

In *Green-Younger*, the Second Circuit disagreed with the ALJ's determination that the claimant was not credible for two reasons. First, the court reasoned that the treating physician's diagnosis of fibromyalgia bolstered the credibility of Green-Younger's complaint. *Id.* at 108; *see also Forehand*, 364 F.3d at 988 (disagreeing with the ALJ's finding that claimant's testimony was not credible because "the medical reports of many treating physicians amply support her

allegations of pain and limitation"). Second, the reason cited by the ALJ for discrediting claimant's testimony - that the absence of physical abnormalities discredited the veracity of her complaints - should not undercut a claimant's credibility in a fibromyalgia case. *Id.* The court emphasized that there are no physical abnormalities with fibromyalgia. "In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results." *Id.* at 108-109 (*quoting Preston*, 854 F.2d at 818). Similarly, in *Swain*, the district court ordered that, on remand, the ALJ reconsider his credibility findings of claimant because the previous assessment of credibility placed "undue emphasis" on the absence of objective medical evidence. *Swain*, 297 F.Supp.2d at 994. The district court instructed the ALJ to give "due consideration" to the need to go beyond objective evidence in evaluating fibromyalgia cases. *Id.*

In this case, the ALJ considered Plaintiff's testimony and allegations and found her not credible. Specifically, he found that her testimony included numerous inconsistencies. For example, Plaintiff told Dr. McCain that Darvocet alleviated 50% of her pain, but Plaintiff testified at the hearing that it did not help at all. (AR 17). The ALJ also noted the inconsistencies in Plaintiff's statements about the grade level she completed. The ALJ found that Plaintiff "exaggerated her story throughout the medical record and at the hearing." (*Id.*). Plaintiff reported to Dr. Payne that her symptoms were so severe that she could do no more than self-care. The ALJ noted that Plaintiff made this statement to Dr. Payne in the same month in which she filed her disability claim (April 2001) and determined that claimant probably made this statement

"in an attempt to bolster her disability claims." ( *Id.*).  Plaintiff also stated at the hearing and to several treating physicians that her pain was a "ten" on a scale of one to ten.

In *Swain*, *Green-Younger*, and *Forehand*, the ALJs placed undue emphasis on the absence of objective medical evidence to discredit the claimants.  In this case, the ALJ discredited Jackson's statements about the presence and severity of her pain even though her statements were corroborated by the reports and opinions of numerous doctors.  Thus, the Court orders that the ALJ reconsider Jackson's testimony in light of this opinion and the peculiar diagnostic techniques associated with fibromyalgia.  The Court further orders that the ALJ articulate specific reasons for his credibility determinations.

## V.  CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Commissioner's Determination be **REVERSED** and the matter be **REMANDED** to the ALJ to be reconsidered in light of this opinion.

**Signed: October 12, 2005**

Richard L. Voorhees
United States District Judge